## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| v. | ) CRIMINAL NO. 3:2007-10 |
| | ) |
| GENE G. PARSON, | ) JUDGE GIBSON |
| | ) |
| Defendant. | ) |

# Opinion and Order

**GIBSON, J.**

This matter comes before the Court on Defendant Gene Parson's Motion to Suppress (Doc. No. 42). On June 18, 2008, the Court heard testimony and admitted evidence during a hearing on Defendant's Motion ("Hearing" or "Hr'g"). The foremost issue is whether Parson's consent to search was involuntary due to law enforcement's misrepresentations to Parson that he was a victim of identity theft. The Court makes the following Findings of Fact, based upon the evidence and testimony presented at the Hearing. Analyzing these facts in light of Fourth Amendment jurisprudence regarding the effect of law enforcement ruses upon voluntariness of consent, the Court concludes that Defendant's Motion shall be granted.

## FINDINGS OF FACT

1.     In November, 2004, the National Center for Missing and Exploited Children provided information to the Immigration and Customs and Enforcement Center ("ICE") Cyber Crimes Center regarding several websites that were suspected of hosting and offering child pornography. *See* Collateral Request, Doc. No. 42, Ex. 1.[1]

2.     ICE Special Agent Michele Dowling, with assistance from forensic computer experts, determined that the suspect websites hosted and offered child pornography. Collateral Request,

---

[1]This exhibit, like others discussed in this opinion, was introduced at the Hearing. Where Hearing exhibits are also attached to motions on this Case's Docket, they will be referenced to by their location on the Docket so as to facilitate ease of reference. *See* Hr'g Tr., p. 6

Doc. No. 42, Ex. 1. 6 Agent Dowling, posing as an interested subscriber to the suspect website, was charged $79.00 or $80.00 for access to the illegal site. Hr'g Tr., p. 14.

3.  Agent Dowling and computer forensic experts determined Verio, Inc. hosted some of the websites. Collateral Request, Doc. No. 42, Ex. 1. Search warrants were executed at Verio, Inc., and other locations. Investigators discovered identifying information for users of the child pornography websites, including IP addresses and home addresses. Collateral Request, Doc. No. 42, Ex. 1.

4.  ICE issued a Collateral Request to various ICE authorities in districts where the suspects lived, including the Pittsburgh district. The Request stated: "ICE/CE requests that the above listed offices review the information contained in this Report of Investigation and CD-R and attempt to use the information as the foundation for obtaining a search warrant for the computers and associated removable media located at the suspect addresses." This investigation was named "Project Watchdog." Collateral Request, Doc. No. 42, Ex. 1, at 11; Hr'g Tr., p. 5.

5.  On or about June 24, 2005, Pittsburgh ICE Special Agent James Stitzel received the Collateral Request. Hr'g Tr., p. 5. Agent Stitzel consulted Assistant United States Attorney Tina Miller on matters relating to this investigation. Hr'g Tr., p. 9; September 13, 2005 ICE Report, Doc. No. 42, Ex. 5.

6.  The Collateral Request identified targets, and provided a database for purposes of generating specific reports on each identified subscriber.[2] Collateral Request, Doc. No. 42, Ex. 1.

7.  Agent Stitzel received a CD-R along with the Collateral Request, which contained a database with information about the targets. Hr'g Tr., pp. 6-7. This database, Government Exhibit 1, contains the name of the website visited, the date of the transaction, the name of the subscriber in the website, the subscriber's address and telephone number, the Internet Protocol (IP) address of the computer that accessed the site, and the credit card type, number, security code, and expiration date. Database, Doc. No. 42, ex. 3.

8.  Government Exhibit 2 contains a summary sheet of all 43 database entries dealing with Parson. Each entry represents a visit by Parson's computer and e-mail address, "ehtweety@mail.com," to a child pornography website, using a credit card with Parson's name. Summary of database, Doc. No. 42, Ex. 2. This summary sheet contains Parson's email address, name, credit card

---

[2]The Collateral Request stated: "The instant investigation is a joint project between C3, SAC/DC, SAC/Baltimore, and DOJ/CEOS. To date, several thousand subscribers have been identified. This collateral request documents 127 subscriber leads. A package will be forwarded to the affected field offices. The package will contain a spreadsheet identifying the 127 subscribers, copies of the teaser and payment sites the identified subscribers visited, a database containing all relevant subscriber information, a go-by search warrant drafted in conjunction with DOC/CEOS, and a Power Point presentation detailing the investigation. Each office will be able to query the database provided and generate specific reports on each identified subscriber, including site access pages." Collateral Request, Doc. No. 42, Ex. 1, at 11.

2

number, and address. Hr'g Tr., pp. 10-11.

9. After reviewing Government Exhibit 1, Agent Stitzel performed further investigation, utilizing public sources to discover Parson's birth date, driver's license record, address, and photograph. Hr'g Tr., p. 8.

10. Agent Stitzel also performed a query for Gene Parson's IP address. Hr'g Tr., p. 8.

11. Agent Stitzel then sought grand jury subpoenas of Verizon to see if Parson still had Internet access through Verizon. Hr'g Tr., p. 51. Agent Stitzel received information from Verizon that Parson or someone living at the residence in Tyrone, PA had current internet access. Hr'g Tr., p. 14.

12. Two credit cards (the '517 card and the '545 card), bearing the name of Gene Parson, were used to access the websites. Hr'g Tr., pp. 12-13.

13. Having obtained information from the U.S. Postal Service task force that the '517 credit card was a Capital One card, Agent Stitzel sent a subpoena to Capital One to obtain further information on the use of the '517 card. Hr'g Tr., pp. 9-10.

14. The government only sought a subpoena for the records of the '517 credit card. Twenty-nine of the 43 visits to suspect websites were made with the '545 credit card. Doc. No. 42, ex. 2. Agent Stitzel testified that the failure to seek a subpoena on the '545 card was an "oversight." Hr'g Tr., p. 13.

15. Having received the '517 credit card records from Capital One, Agent Stitzel failed to find $79 or $80 purchases as anticipated. Hr'g Tr., pp. 15-16. However, while Agent Stitzel was concerned as to why there was not a charge of $79.00 or $80.00 on Mr. Parson's '517 card, he was also aware, based on his experience, that individuals who display an interest in child pornography usually download it, collect it, share it, and store it quite frequently. Hr'g Tr., pp. 17-18.

16. The records from Capital One regarding the '517 credit card revealed frequent and consistent monthly online purchases of $40-50. Doc. No. 42, ex. 7.

17. The credit card was paid on-line and on time; charges were modest and consistent. Doc. No. 42, ex. 7. As acknowledged by Agent Stitzel, the bills contained no evidence of identity theft. Hr'g Tr., p. 57.

18. When asked whether he had any other concerns about the use of the '517 card, Agent Stitzel responded: "Sure. There is always a chance that someone had accessed that without Parson's knowledge." Hr'g Tr., p. 19. However, he acknowledged that this scenario was a "remote possibility." Hr'g Tr., p. 62.

3

19.  Agent Stitzel acknowledged that the Collateral Request did not suggest any of the suspects were victims of identity theft. Hr'g Tr., p. 31.

20.  The Court concludes that Agent Stitzel himself did not believe that Parson was a victim of identity theft. The Court also concludes that no objective evidence exists that suggests the possibility of identity theft.

21.  During Agent Stitzel's ten years in law enforcement, he has prepared one or two search warrants relating to child pornography violations, while participating in seven to ten "knock-and-talks." Hr'g Tr., pp. 31-32. During Agent Stitzel's five years as an ICE agent, he has conducted or been involved with fifteen to twenty child exploitation investigations. Hr'g Tr., p. 7. In each knock-and-talk conducted, Agent Stitzel brought up the possibility of identity theft. Hr'g Tr., p. 32.

22.  Based on the evidence gathered, and his suspicion that Parson possessed electronically stored child pornography, Agent Stitzel planned to conduct an interview of Parson at his residence to investigate the "possibility that [a] credit card belonging to Parson had accessed an international website that allowed child pornography for a fee." Hr'g Tr., p. 19. It appears that Agent Stitzel was hesitant to seek a warrant because the information obtained relative to Mr. Parson in the "Project Watchdog" report showed access to the suspect website in January of 2005, and the investigation was now into the early months of 2006. Hr'g Tr., p. 19.

23.  Agent Stitzel contacted Pennsylvania State Police Trooper Charles Schaefer to verify Parson's address and ask "if he had any information [regarding Parson]." Hr'g Tr., 19. Agent Stitzel told Pennsylvania State Police Trooper Chuck Schaefer that he was investigating a child pornography case. Hr'g Tr., pp. 102-03.

24.  On March 2, 2006, Agent Stitzel, ICE Special Agent Michael O'Neill and Trooper Schaefer arrived at Parson's home in Tyrone, PA. Hr'g Tr., pp. 19-20

25.  At this time, Parson was 65 years old. He collected Social Security benefits of $725 per month. While living in a small trailer on his brother's land, Parson worked part time as a repairman at his brother's used car lot. Parson is hard of hearing. He does not see well due to cataracts, and has a history of taking medication for depression. Hr'g Tr., pp. 126-27.

26.  Parson did not have wireless Internet access. Hr'g Tr., p. 134.

27.  The time of arrival was likely in the afternoon. Hr'g Tr., p. 20. Parson had just laid down to take a nap prior to the agents' knock. Hr'g Tr., p. 131.

28.  The ICE agents and Trooper Schaefer were all in plain clothes; they introduced themselves and showed their badges to Parson. Hr'g Tr., pp. 20, 131, 133, 148.

4

29. Agent Stitzel advised Mr. Parson that "there was a chance he could be a victim of identify theft." Hr'g Tr., pp. 20, 93.

30. It appears unlikely[3] that the agents specifically informed Parson on the doorstep that they were investigating child pornography. Agent Stitzel testified that he advised Parson that he was "investigating this international website that's allowing access to child pornography for a fee." However, Trooper Schaefer testified that "They [the ICE agents] talked to him about a credit card that was his and they mentioned that there was a possibility of some identity theft regarding an international website." Hr'g Tr., p. 93 (emphasis added). Also, Agent O'Neill testified that Agent Stitzel advised Parson "that we were there concerning a possible identity theft involving his credit card accessing I believe it was an international website." Hr'g Tr., 113. The Court finds that the weight of the evidence indicates that the agents emphasized identity theft, while only briefly and casually mentioning the context of an international website.[4]

31. Agent Stitzel asked if Parson had the '517 credit card. Parson responded affirmatively, and took the credit card out of his wallet to show it to Agent Stitzel. Hr'g Tr., p. 22. Agent Stitzel told Parson that "Capital One was being hit very hard for identity theft." Hr'g Tr., p. 132.

32. Agent Stitzel asked if they could come in to discuss the identity theft situation. Hr'g Tr., pp. 21, 94, 113, 120.

33. Parson allowed the men entry into his home, because he was in "shock" and "thought they were there to help [him]" with the identity theft problem. Hr'g Tr., 133. After receiving this notification of potential identity theft problems, Parson was "shook up", and wondered "what am I going to do?" Hr'g Tr., 132.

34. Agent Stitzel asked Parson if had any problems with that card. Parson responded no, but offered that he previously had problems with another card. Hr'g Tr., p. 22. Agent Stitzel asked Parson if he ever used his credit card to make on-line purchases. Parson responded yes. Hr'g Tr., p. 134.

35. The parties disagree as to what happened subsequent to this question. The agents claimed that the conversation shifted directly to child pornography; Parson testified that he could not recall

---

[3]As is perhaps inevitable given the substantial time gap between the date of the visit and the date of the Hearing, Agent Stitzel presented uncertain recollections of the precise progression of conversation on the doorstep. For instance, at the Hearing, Agent Stitzel explained that he did not mention a credit card on the doorstep. Hr'g Tr., 22. However, in grand jury testimony, he stated: "we asked if we could come in and speak to him with reference to his credit card that was used. Parson pulled out the credit card and showed us the credit card and verified the number, which was same as that had accessed child pornography sites." Hr'g Tr., p. 83. Furthermore, when asked by a prosecutor in June, 2007 to prepare a supplemental report, Agent Stitzel refused to do so because he could not recall the words spoken at the doorstep sufficient to create a report. Hr'g Tr., pp. 18, 73.

[4]Given the equivocal testimony from the three law enforcement officers regarding statements made on the doorway, the Court cannot find that law enforcement notified Parson at the outset that they were conducting an investigation of an international child pornography website.

5

any discussion about child pornography at this point. Hr'g Tr., p. 23. The Court finds that the evidence is ambivalent regarding the subject of conversation at this point. While this conversation, and the possible discussion of images of children, especially if raised by Parson, is relevant to the issue of consent, it is not dispositive and thus does not require firm resolution. Importantly, when considering such divided factual accounts, the Court notes that the burden of proving voluntariness of consent rests with the government.

36. The agents asked to look at his computer following a discussion that was "basically about identity theft problems." Hr'g Tr., pp. 34, 134. Parson thought that the men were there to help him with his identity theft problems, so he turned on the computer. Hr'g Tr., p. 134. Parson began to feel that something was not right, and that these men possibly were actually criminals posing as law enforcement. Parson was afraid to refuse the three men's request to allow them on his computer. Hr'g Tr., p. 134. Agent Stitzel characterized Parson as "very cooperative" throughout this process. Hr'g Tr, p. 25.

37. Agent Stitzel directed Parson to open a "folder lock" icon on his computer. Parson appeared to be "very versed and very knowledgeable on computers and how [they] operate[]." Hr'g Tr., p. 25. Parson typed the password "bologna" to open the folder lock. Agent Stitzel asked Parson for the password and Parson provided it to him. Hr'g Tr., p. 142. This password was written down on the top of the consent to search form. Hr'g Tr., p. 142.

38. The men began looking at a list of files. Agent Stitzel directed Parson to open a file labeled "stick out," which opened to a picture of a nude girl, nine to twelve years old, with her genitals exposed. Hr'g Tr., pp. 24-25, 97-98, 115, 136-137.

39. Agent Stitzel asked where this picture came from. Parson told him that the picture came from a website called Lolita portal.net. Hr'g Tr., p. 139.

40. Parson asked whether the picture of the young girl was child pornography, and whether he could be arrested for having that type of picture. Hr'g Tr., pp. 25, 116,139. Agent Stitzel replied that they were "not the ones who determined that." Hr'g Tr., p. 139. Agent Stitzel also told Parson: "that's not why [we are here], that's not what [we are] looking for." Hr'g Tr., p. 138. Parson did not believe that there was anything wrong with the pictures he had. Hr'g Tr., p. 164.

41. Parson testified that these exchanges caused him to question whether the men were law enforcement at all. Parson thought the men themselves may be criminals trying to obtain his identity. Hr'g Tr., p. 138

42. The agents subsequently prepared to take the computer for forensic examination. Parson testified that Agent Stitzel announced "we're going to take this stuff" while beginning to unhook the computers. Hr'g Tr., p. 140. Agent Stitzel testified that he advised Parson that he did not have to sign the form; however, Parson claims he was never told that he did not have to consent. Hr'g Tr., pp. 142-43. This factual issue regarding knowledge of ability to refuse consent, while

6

relevant, is not dispositive. Parson felt as if he were instructed to sign the form along with two other forms. Hr'g Tr., pp. 142-43.

43. Parson did not read the form because he has difficulty reading due to cataracts. Also, he was afraid and just wanted the men out of his home. At this point, he was convinced that the men were simply trying to steal his computer and identity. Hr'g Tr., p. 142. He was "still thinking about the identity theft and what I have to do to take care of it." Hr'g Tr., p. 144. Parson asked no questions about the consent form or the seizure of his computer. Hr'g Tr., p. 28.

44. Parson signed a blanket consent form permitting the agents to conduct a complete search of his computer and "to take any letters, papers, materials, or other items/property which they may desire." Consent Form, Doc. No. 42, ex. 8; Hr'g Tr., pp. 26-27, 88, 99, 117.

45. The Consent Form did not include any of the following: the purpose for such a search, any specific items for which the agents were searching, or that Parson could refuse to consent to the search and seizure of his computer. Consent Form, Doc. No. 42, Ex. 8.

46. The Consent Form identified the agents as "Officers of the Department of Treasury, United States Customs Service." Consent Form, Doc. No. 42, Ex. 8.

47. The agents seized one computer, one hard drive, CDs and videotapes, and other materials. Hr'g Tr., p. 28. Parson assisted the agents in preparing the computer equipment for transport. Hr'g Tr., p. 28.

48. The total time the agents spent within the trailer was less than one hour. Hr'g Tr., p. 29. The interactions were never confrontational. Hr'g Tr., p. 29.

49. The government conducted a forensic examination of two computers, one hard drive, and 33 CD-ROMs. The government found approximately 13,000 images and 128 videos of suspected child pornography. Hr'g Tr., p. 29.

50. After the agents left, Parson went "straight down to [his] bank" to attempt to protect his assets. He spoke with a bank employee about his situation. That bank employee called Agent Stitzel's phone number. The bank employee changed Parson's account numbers. Parson stopped his credit card, and contacted Social Security to place a fraud warning and change his direct deposit information. Hr'g Tr., pp. 144, 155

51. Agent Stitzel acknowledged receiving a call from someone at Parson's bank, although he remembered little about the conversation. Hr'g Tr., pp. 85-86.

52. Agent Stitzel called Parson later that same day to tell him that he found out that Parson had been to the bank. Agent Stitzel advised Parson that Parson would hear from them soon. Hr'g Tr., p. 146. Agent Stitzel also explained to Parson that he did not believe that Parson was a victim of

7

identity theft. Hr'g Tr., p. 86.

53.    During the in-home visit, the agents never informed Parson that he was being investigated for possession of child pornography. Hr'g Tr., pp. 146-47.

54.    On June 17, 2007, Agent Stitzel telephoned Parson and told him to be at home at a certain time to accept a package. The agents then arrested Parson at his home at the appointed time. Hr'g Tr., pp. 87, 146.

## CONCLUSIONS OF LAW

### I. Introduction

Defendant Parson moves this Court to suppress evidence and statements obtained as a result of

law enforcement's entry of his home, and search and seizure of his computer. Parson argues that this

search and seizure was conducted without a search warrant as required by the Fourth Amendment. The

government argues that Parson voluntarily consented to the search, thus removing the need for a

warrant. Parson responds that any such consent was invalid in that it was not voluntary, but rather the

product of a deliberate and manipulative ruse. Thus, the parties dispute the validity and scope of this

consent.

### II. Whether the Images Obtained from the Computer Equipment Should be Suppressed

#### A. Fourth Amendment Protects Vital Personal Liberties

The Fourth Amendment is perhaps a citizen's most substantial defense against oppressive and

unjust government intrusions. It provides:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be violated,
> and no Warrants shall issue, but upon probable cause, supported by Oath
> or affirmation, and particularly describing the place to be searched, and
> the persons or things to be seized.

8

U.S. Const. amend IV.

The Fourth Amendment has been interpreted to broadly prohibit police from entering a home to conduct a search or make an arrest without a warrant. *Steagald v. United States*, 451 U.S. 204, 211, 101 S. Ct. 1642, 1647, 68 L. Ed. 2d 38, 45 (1981)("Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant.") (citing cases). Searches and seizures inside the home without a warrant are presumptively unreasonable absent exigent circumstances; the Supreme Court's Fourth Amendment jurisprudence emphasizes the sanctity of the home. *Payton vs. New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379, 63 L. Ed. 2d. 639, 650 (1980) ("the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'") (quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752, 764 (1972).

The Supreme Court explained: "'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.' With few exceptions, the question of whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 30, 121 S. Ct. 2038, 2041-42 150 L. Ed. 2d 94, 100 (2001) (citing cases).

In short, within an individual's residence, privacy interests reach their apex. The mechanism of warrants serves to balance those weighty privacy interests against society's interest in the proper enforcement of laws. Where, as here, law enforcement inexplicably chooses to forgo the warrant process, while nonetheless executing a plot to encroach upon the sanctity of a citizen's privacy, such actions will be subjected to careful judicial scrutiny.

9

The government bears the burden of proving by a preponderance of the evidence that exigent

circumstances existed for its warrantless actions. *See Sharrar v. Felsing*, 128 F.3d 810, 820 (3d Cir.

1997) ("The government bears the burden of proving that exigent circumstances existed: 'Before agents

of the government may invade the sanctity of the home, the burden is on the government to demonstrate

exigent circumstances that overcome the presumption of unreasonableness that attaches to all

warrantless home entries.'"(quoting *Welsh v. Wisconsin*, 466 U.S. 740, 750, 80 L. Ed. 2d 732, 104 S.

Ct. 2091 (1984))).

## B. Voluntariness of Consent to Entry and Search

To meet this burden, the government asserts that a search warrant was not required because Mr.

Parson consented to the entry of his home and the search of his computer equipment. A validly

obtained and voluntary consent renders a search or seizure reasonable, thus eliminating the need for a

warrant. *Katz v. United States*, 389 U.S. 347, 358 n. 22, 88 S. Ct. 507, 515, 19 L. Ed. 2d 576, 586

(1967); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2045, 36 L. Ed. 2d 854, 860

(1973). In *United States v. Drayton*, the Court explained:

> In a society based on law, the concept of agreement and consent should
> be given a weight and dignity of its own. Police officers act in full
> accord with the law when they ask citizens for consent. It reinforces the
> rule of law for the citizen to advise the police of his or her wishes and for
> the police to act in reliance on that understanding. When this exchange
> takes place, it dispels inferences of coercion.

536 U.S. 194, 207, 122 S. Ct. 2105, 2114, 153 L. Ed. 2d 242, 255 (2002).

Courts carefully consider the circumstances under which consent is obtained; in particular, such

consent must be given voluntarily, rather than being the result of duress. Consent is voluntary if it is

"the product of an essentially free and unconstrained choice by its maker." *See Schneckloth*, 412 U.S.

10

at 225, 93 S. Ct. at 2047, 36 L. Ed. at 862.

The Supreme Court characterized consent as a "jealously and carefully drawn exception" to "the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*." *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S. Ct. 1515, 1520, 164 L. Ed. 2d 208, 218-19 (2006) (citations removed); *see also United States v. Dichiarinte*, 445 F.2d 126, 129 n.1 (7th Cir. 1971) (explaining that "consents to search are carefully examined for evidence of coercion or duress.").

The government has the burden of proving, by a preponderance of evidence, that the consent was, in fact, freely and voluntarily given. *Schneckloth*, 412 U.S. at 222, 93 S. Ct. at 2045, 36 L. Ed. at 2045 ("'[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.'") (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548).

Voluntariness "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S. Ct. 2048, 36 L. Ed. at 863. The Supreme Court found it useful to refer to the definition of "voluntariness" developed in cases that assess voluntariness of a defendant's confession. *Id.* at 223-26, 93 S. Ct. at 2045-47, 36 L. Ed. at 860-62. ("The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances.").

Thus, this Court examines the effect of the totality of the circumstances upon the will of the defendant. *See Miller v. Fenton* , 796 F.2d 598, 604 (3d Cir. 1986). This assessment of the circumstances includes analyzing "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226, 93 S. Ct. at 2047, 36 L. Ed. at 862. Certain Circuits have delineated lists of factors to be assessed that instruct the Court in the types of matters that may be

11

relevant.[5] The Third Circuit recently explained: "'[T]he critical factors comprising a totality of the circumstances inquiry include the setting in which the [search] consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party].'" *United States v. Crandell*, 554 F.3d 79, 88 (2009) (quoting *United States v. Wilson*, 413 F.3d 382, 388 (2005)). In this matter, this Court finds that the following factors are particularly relevant: age of the accused; extent of intimidation by law enforcement; the accused's physical and mental condition at the time; and the nature of any misrepresentations by the government. However, any such enumerated factors are never applied mechanically, and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir. 1993); *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000). In short, this Court may examine any and all factors that are relevant to the question in issue: whether Parson voluntarily consented to the entry into his home, and the search and seizure of his computer and related items.

## 1. Analysis of the Agents' Misrepresentation Regarding an Identity Theft Investigation

This Court finds that the most significant factor in the voluntariness analysis is the extent to which the agents' emphasis on identity theft influenced Parson's supposed consent.

### a. Substantial Misrepresentation is Analogous to Physical Coercion

In numerous contexts, such as guilty pleas and confessions, voluntariness requires absence of coercion. To be valid, consent to a search and seizure cannot be coerced. *Schneckcloth,* 412 U.S. at

---

[5]*See, e.g., United States v. Chaidez*, 906 F.2d 377, 381(8th Cir. 1990) (listing factors, relating to both persons and environments, as follows: (1) age; (2) general intelligence and education; (3) influence of substances (4) whether they were informed of right to withhold consent, of Miranda rights, and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system; (6) the length of detainment and questioning; (7) threats, intimidations or punishments; (8) reliance upon police promises or misrepresentations; (9) whether in custody or under arrest; (10) public or secluded nature of locale; (11) objections raised to the search.).

12

228 ("[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion were applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."). While the definition of misrepresentation may be distinguishable from that of direct physical coercion, the judicial reasoning behind requiring non-coercive consents is equally applicable to misrepresentation. Specifically, where material misrepresentations play a direct role in obtaining the consent, such consent may be as involuntary as a coerced confession.

For instance, in *Bumper v. North Carolina*, police falsely claimed they had a warrant. 391 U.S. 543, 549, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). The Court found that consent was involuntary, because the police's material misrepresentation served to overcome the Defendant's will to withhold consent. *Id.*

The agents' in the case *sub judice* may not have utilized direct coercion in terms of the application of physical force; however, as shown in *Bumper*, misrepresentations can essentially accomplish the same malevolent purpose as coercion, and thus the consent obtained thereby should be similarly invalidated. *See Blackburn v. Alabama*, 361 U.S. 199, 206, 4 L. Ed. 2d 242, 80 S. Ct. 274 (1960) ("A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion'."). Where government tactics involve less substantial misrepresentations than present in *Bumper*, a court should analyze the extent to which the deceit directly served to overcome a citizen's reticence or resistence to the search. *Cf. Miller v. Fenton*, 796 F.2d 598, 603 (3d Cir. 1986) (explaining that a confession is involuntary if defendant's will was overborne).

### b. The Agents' Misrepresentations Contributed to Overcoming Parson's Will

In this matter, the agents informed Parson that he may be a victim of identity theft, thus presenting themselves as being focused upon an identity theft problem. The government defends the agents' statements and actions by downplaying the significance or falsity of their statements. Doc. No. 151, p. 10. However, the facts of the encounter show that the agents' statements about identity theft were constantly on the mind of Parson, and this fear played an integral role in obtaining his consent. The evidence conclusively shows that the agents did not suspect any identity theft in Parson's situation. Additionally, no objective evidence suggests any possibility of identity theft.[6]

At the outset of the encounter, immediately following introductions, the agents informed Parson that he "may be a victim of identity theft." This identity theft warning functioned to facilitate Parson's trust, and enable entry into his home. Importantly, identity theft was the first matter communicated by Agent Stitzel. Comments subsidiary to the Agents' initial identity theft warning likely sounded like filler to someone worried about the initial headline of identity theft. Additionally, Agent Stitzel did not warn Parson that he was a target, or that the agents were investigating the illegal possession of child pornography. Agent Stitzel likely mentioned an international website; however, any such statement could easily have been interpreted as a simple adjunct to the stated theme of identity theft. The topic of a news story is typically best summarized by its title and first line. An essay presents an early thesis statement that presages later analysis. In like manner, Agent Stitzel's first sentence announced that this visit to Parson's home was about identity theft; it was this statement that defined, in Parson's mind, the

---

[6]The government did not present any legitimate evidencethat identity theft had occurred, or was a concern; it was simply not a plausible scenario.

14

purpose of the agents' visit.

The government claims that the identity theft introduction is defensible in that it was literally truthful and accurate. The Court disagrees, and disapproves of this "literal truth" defense. Given the function and purpose of verbally expressed language, a communicative phrase such as that uttered by Agent Stitzel simply cannot be defined absent its context. In this matter, the phrase was uttered by an ICE agent on the doorstep of a poor and intimidated senior citizen. Yet the government somehow claims that the phrase was not misleading because it is literally true. In essence, the government argues "who knows, after all, whether Parson was a victim of identity theft—we all might be?" This venture into abstraction is inappropriate.

Rather, the Court finds that this language must be assessed in its context, including its speaker, the setting, and the listener. Agent Stitzel spoke the phrase for one purpose: to convey to Parson that he was a victim of identity theft. Agent Stitzel did not convey to Parson that it was only a remote possibility that he was a victim of identity theft. Imagine a conversation in front of a soda machine, wherein Officer A asks Officer B: "Hey, do you have an extra quarter?" Under the government's reasoning, Officer B would interpret the phrase literally, respond "yes", and walk off. However, the remainder of society, and this Court, if responding for Officer B, would intuit from shared norms and the circumstances of the situation that Officer A, despite the literal meaning of the words within his query, is in fact asking to borrow a quarter.

In short, this Court concludes that the language used by the agents on the doorstep was deceptive and deliberately misleading. Hence, the visit became problematic from a Fourth Amendment perspective the moment that the agents misled Parson into believing that he was a victim of identity theft. Parson invited the officers into his home as a direct consequence of the representation that he was

15

a victim of a crime. This invitation to entry, then, was certainly not the voluntary act of someone knowingly agreeing to concede privacy interests.

Furthermore, the agents prolonged their deception regarding identity theft in order to facilitate first access to, and then seizure of, Parson's computer. Parson claims that under the guise of assisting him to resolve his identity theft problems, the agents instructed him to turn on his computer, insisted that he open a file marked "folder lock", and provide them with the password to this file. The agents claim that Parson initiated the inquiry and offered to show the supposedly legal pictures to the officers. While a complete and accurate knowledge of this particular sequence of events would obviously be helpful to the Court's determination, resolving this factual issue one way or another would not materially change the Court's conclusion.

Upon the joint viewing of the image, Parson indicated where he obtained the picture, and his belief that it was not illegal. He asked the agents if he could get in trouble for having this type of picture. The agents responded that they were not the ones who decided that, and that was not what they were there to look for. This particular deceit cannot be argued as true even if removed from context or pondered in the abstract. Stating that they were not looking for child pornography, nor responsible for determining the legality of pictures, was a direct misrepresentation about the purposes of the agents' visit. Professor LaFave writes:

> [W]hen the police misrepresentation of purpose is so extreme that it
> deprives the individual of the ability to make a fair assessment of the
> need to surrender his privacy, as in *People v. Jefferson*, where police
> gained entry to defendant's apartment on the false claim they were
> investigating a gas leak, the consent should not be considered valid.
> Also, it is one thing for the police to conceal the true purpose underlying
> the seeking of consent, but quite another to state (even truthfully) the
> purpose of the contemplated search and then add to it a strong indication
> that evidence of some other type, if found, would be ignored.

16

> Concealment of the true purpose is also likely to be deemed unfair
> where, absent any consent, the search could be lawfully made for the
> purported purpose but not for the concealed purpose.

2 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 3.10(c) (3d ed. 2007) (footnotes omitted).

In pretending to be investigating identity theft, the agents in this matter are easily analogized to *Jefferson's* policemen, who posed as utility workers and claimed to offer assistance with a possible gas leak. *People v. Jefferson*, 350 N.Y.S. 2d 3, 3-5 (N.Y. App. Div. 1973).

Following their disavowment of interest or expertise in child pornography, the agents informed Parson that they would be taking his computer. Having been expressly told that the men were not looking for child pornography, Parson could only assume that the men meant to aid him with his newly realized identity theft problem. He signed the forms they handed him without reading them.

The most compelling evidence in this matter is Parson's behavior following the agents' exit. Parson immediately rushed to his bank, changed account numbers, and changed his social security direct deposit information. Throwing aside competing stories of precisely what was said, and in what order, this action objectively illustrates that as a result of the agents' visit, Parson believed he was a victim of identity theft. His state of mind was rushed and panicked. His immediate move to protect his identity illustrates that the agents' words and actions inculcated Parson with an honest fear of a stolen identity. Such fear interferes with any supposed intelligent or voluntary agreement with the police to search his computer. Rather, Parson was intimidated into submission by the specter of financial ruin; such a context, created and calculated by the agents, strongly indicates that voluntarily consent was not possible.

17

### c. The Agents' Misrepresentations Violated Widely Shared Social Expectations

The agents' lies and trickery in this matter violated widely shared social expectations. The Supreme Court instructed that in assessing consent for Fourth Amendment purposes, great significance should be given to "widely shared social expectations." *Georgia v. Randolph*, 547 U.S. 103, 111, 126 S. Ct. 1515, 1521, 164 L. Ed. 2d 208, 220 (2006). Numerous cases establish that government misrepresentation as to the purpose of the visit, or the scope of the investigation violates widely shared social expectations.[7]

In this situation, the agents lied about their purpose and claimed to be on alternative government business. Lies such as this, if condoned, would obliterate citizens' widely shared social expectations that they may place some modicum of trust in the words of government officials acting as such. Society expects that law enforcement officers who present themselves and show badges will be honest and forthright with the community that they serve.[8] The catastrophic consequences for a society which loses trust in its constables may be conjured without even the exercise of any creative effort.

---

[7] *See United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) (failing to disclose purpose of visit violated Fourth Amendment; "A ruse entry when the suspect is informed that the person seeking entry is a government agent but is misinformed as the purpose for which the agent seeks entry cannot be justified by consent."); *Graves v. Beto*, 424 F.2d 524, 525 (5th Cir. 1970) (explaining that police violated defendant's Fourth Amendment rights when they obtained his consent to obtaining a blood sample by representing that it would be tested for alcoholic content in connection with an arrest for public drunkenness, and failed to disclose that it would be tested for blood type in connection with a murder investigation; police may not "secure by stratagem what the Fourth Amendment requires a warrant to produce"). *United States v. Tweel*, 550 F.2d 297, 300 (5th Cir. 1977) (lying to target of investigation regarding whether investigation was civil or criminal vitiated consent). *Tweel* explained: "Since the consent given by appellant was obtained by deception, the microfilming of the documents constituted an unreasonable search in violation of the Fourth Amendment." *Id. Tweel* further characterized the governmental conduct at issue as "a sneaky deliberate deception by the agent" and "a flagrant disregard for appellant's rights." *Id.* at 299.

[8] Notably, this matter differs substantially from instances where law enforcement acts in an undercover capacity. Analysis of undercover operations requires a different balancing of privacy expectations, and society's interests. *See* Hoffa v. United States, 385 U.S. 293, 87 S. Ct. 408; 17 L. Ed. 2d 374 *(1966) (holding no reasonable expectation of privacy where person seeking admission is invited in to commit a crime, without the suspect knowing that the person admitted is a police officer).*

18

In the context of assessing an agency's failure to obtain proper administrative subpoenas, and consequently lying to obtain consent, the Fifth Circuit explained:

> We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. We think it clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.

*Sec. and Exch. Comm'n v. ESM Gov't Sec., Inc.*, 645 F.2d 310, 319 (5th Cir. 1981).

While troubled by the agents' deception regarding the theft of Parson's identity, the Court acknowledges that one single factor is not dispositive in this matter; rather, the Court considers all additional aspects of the interaction. *See United States v. Andrews*, 746 F.2d 247, 250 (5th Cir. 1984).

## 2. Agents' Ruse Tactics Succeeded in their Design to Intimidate Parson

The Court further finds that the agents' misrepresentations were particularly designed to intimidate Parson; this intimidation factor further weighs against voluntary consent. *See Alexander v. United States*, 390 F.2d 101, 110 (5th Cir. 1968) ("Intimidation and deceit are not the norms of volunteerism. In order for the response to be free, the stimulus must be devoid of mendacity. We do not hesitate to undo fraudulently induced contracts. Are the disabilities here less maleficent?"). *Alexander* strongly stated that allowing such law enforcement "chicanery" would "'obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and a police-state where they are the law.'" *Id.* (quoting *Johnstown v. United States*, 333 U.S. 10, 17 (1948)).

In this matter, three agents entered the small trailer of a 65-year-old man. Speaking from the likely perspective of a public citizen, two agents seem to constitute a necessary and proper investigatory

19

team; however, three agents seem an intimidating force. Parson testified: "I was afraid to refuse doing anything they asked because there's three men there . . . ." Hr'g Tr., p. 143. In a particularly apt description of the coercion inherent in this situation, Parson explained why he allowed the men to walk away with his computer equipment: "And what am I going to do? I'm an old man against three men. What am I going to do?" Hr'g Tr., p. 155.

More importantly, the specter of identity theft added additional coercion and intimidation to the situation. Identity theft is a threat for everyone in our society, from senior citizens to small children. Such attacks occur from around the world and are quickly increasing in number; while most victims likely recover much of the stolen money, or are not held responsible for it, it still takes substantial time and resources to resolve the concerns. *See* Chris Jay Hoofnagle, *Identity Theft: Making the Known Unknowns Known*, 21 Harv. J.L. & Tech 97, 97 (2007). Frankly, anyone approached by a federal officer and told that she may be a victim of identity theft would find such information both believable and concerning.

The government's argument as to intimidation correctly points out there was no "physical punishment" or "deprivation of food or sleep." Doc. No. 51, p. 10. The agents did not display weapons, touch Parson, or make threats or promises. While torture is a subject for another day, this Court affirms that absence of direct physical torture is not strong evidence supporting voluntariness of consent.

**3. Parson's Personal Characteristics Reveal Particular Vulnerability to Agents' Ruse**

Mr. Parson's personal characteristics are highly relevant to the totality of the circumstances analysis as to whether his consent was voluntary. *Schneckcloth*, 412 U.S. at 229, 93 S. Ct. at 2049, 36 L. Ed. at 864 (explaining that in considering voluntariness of consent the Court should consider "the

20

possibly vulnerable subjective state of the person who consents" in order to filter out "searches that are the product of police coercion.").

At the time of the knock-and-talk, Parson was sixty-five years old. His medical history includes frequent bouts with depressive mood disorders, for which he has been medicated. He lived alone, subsiding primarily on a low fixed income provided by the Social Security Administration. His cataracts interfered greatly with his ability to see.

In short, Parson was a particularly vulnerable target for a ploy regarding identity theft. The government rightly raises the issue that Parson has previous experience with the criminal justice system. This Court does not imagine that Parson at no point in the encounter suspected he may be getting into trouble for what he possessed on his computer. Furthermore, Parson also likely understood, given his previous experience in the criminal justice system, that a visit from law enforcement officers does not typically bode well for those visited. Nonetheless, the Court remains convinced that whatever Parson's awareness of himself as a target, such was overborne by the "successful" identity theft ruse. At his age, Parson had limited work opportunities and limited options. Furthermore, senior citizens possess diminished capacity for navigating the channels necessary to fix any such identity theft. In short, Parson was an ideal candidate to be placed in a state of fear and submission via the targeting of his financial vulnerability; this calculus was likely considered by the agents, and becomes yet another factor that weighs against voluntariness.

#### 4. Vague Consent Form Does Not Establish Voluntariness

The United States suggests that the consent form ought to be dispositive of this matter; however, as discussed above, the Court finds numerous problems with the situation under which the form was

21

signed.[9] Additionally, the form itself is generic and vague.[10] In *Ferguson*, the Court held that women who signed consent to treatment forms had not voluntarily consented to searches because the women had not been informed the results would be provided to law enforcement. *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001). Similarly, this Court finds that a bare and generic consent form is not strong evidence in favor of voluntary consent.

### 5. Conclusion: Government Has Not Met its Burden in Demonstrating that Parson Voluntarily Gave Consent to Agents' Entry, Search and Seizure

In conclusion, the government has not met its burden to show that Parson voluntarily consented to the entry of his home, and the search and seizure of his computer and other personal items. In particular, the Court finds that the agents' tactics violated any fair understanding of the privileges of privacy established by the Constitution of the United States. Such tactics, in this instance, served to confuse and frighten Parson, leaving him in a state incapable of consenting to anything, much less the surrender of his Constitutional rights.

Despite this firm conclusion regarding a violation, the question of remedy remains. Where appropriate, the exclusionary rule prevents the use of improperly obtained evidence. *See, e.g.*, *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 58 L. Ed. 652 (1914). In a recent opinion deciding whether to apply the exclusionary rule to errors in police recordkeeping, the Supreme Court reiterated its jurisprudence "that suppression is not an automatic consequence of a Fourth Amendment violation."

---

[9] In this matter, the agents simply announced they were taking the computer and that Mr. Parson needed to sign the form. Mr. Parson could not read the form due to his cataracts. Hr'g Tr., p. 159. The government claims that Parson was told he did not have to consent; however, this option, while important to the issue of voluntariness, is not dispositive.

[10] The form is disturbingly bare, failing to even state such essentials as the purpose of the search. Furthermore, the form could be classified as misleading, due to its indication that the agents are officers of the Department of the Treasury. Doc. No. 42, ex. 8.

*Herring v. United States*, 129 S. Ct. 695, 698, 172 L. Ed. 2d 496, 502 (2009). The Court explained that before applying the exclusionary rule, courts should examine whether the benefits of deterrence outweigh the costs. *Id.* Courts should consider the efficacy of exclusion in deterring future Fourth Amendment violations. *Id.* at 700, 172 L. Ed. 2d at 504. The issue also "turns on the culpability of the police and the potential of exclusion to deter wrongful conduct." *Id.* at 698, 172 L. Ed. 2d at 502. In *Herring*, the Supreme Court found that the conduct at issue was "the result of isolated negligence attenuated from the arrest." *Id.*

In this matter, the law enforcement officers' actions were culpable and flagrant violations that directly resulted in obtaining the evidence at issue. Furthermore, this Court believes that suppression of this evidence will deter future use of this·oppressive and misleading identity theft ruse. Therefore, the Court concludes that the evidence obtained from violations of Parson's Fourth Amendment rights should be suppressed in order to deter law enforcement from future brazen misrepresentations, and abuses of the consent exception. *See Wong Sun*, 371 U.S. 471, 488, 83 S. Ct. 407, 418, 9 L. Ed. 2d 441, 457 (1963);

**C. Even if Parson Voluntarily Consented to a Search, the Scope of this Consent Was Limited to Information that Facilitated an Identity Theft Investigation.**

While the Court finds Parson's consent involuntary, an alternative method of looking at this scenario, and one that ends with the same result, is that Parson consented only to a search and seizure of his property so as to facilitate an investigation into identity theft.

Having obtained a voluntary consent from a private citizen, law enforcement is obligated not to exceed the scope of that consent. In *Florida v. Jimeno*, the Court held that in determining the scope of a valid search based upon consent, the Court should inquire as to what would a reasonable person

23

have interpreted the scope to include. 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-04, 114 L. Ed. 2d 297, 303 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect."). In *Jimeno*, the police officer received permission to search for drugs, and subsequently found a folded up paper bag; the Court concluded that a reasonable person in officer's situation would have determined that the defendant's consent included the right to open the paper bag. *Id.*

Upon analysis of the situation in the case *sub judice*, the Court finds that a reasonable person would have understood that the conversation established only that Parson consented to allowing investigation into alleged identity theft. In particular, the Court finds the agents' disclaimer regarding their interest or expertise in child pornography sets boundaries upon any obtained consent. The agents gained admission to Mr. Parson's home by falsely representing that Mr. Parson was the victim of identity thief, and later obtained consent to take Parson's computer by indicating they were only investigating identity theft crime. As discussed *supra*, such deceptions accrue a particular musk in that the agents had no reasonable basis to suspect any identity theft.

In *United States v. Dichiarinte*, the Seventh Circuit held that where a defendant gave narcotics officers consent to search only for narcotics, search and seizure of documents was beyond scope of consent. 445 F.2d 126, 129 (7th Cir. 1971) ("Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search."). Likewise, in this matter, Parson, even if he gave consent at all, gave consent only as to searching for evidence of identity theft, which would have been the extent of consent as understood by a reasonable person watching the exchange between

24

the agents and Parson. When officers examined the seized computer for illegal child pornography images, they violated the scope of any such consent, and thereby violated Parson's Fourth Amendment rights.

In conclusion, whether because the consent was involuntary, or because the search exceeded the scope of consent, the resolution is the same: the evidence was taken in violation of Parson's Fourth Amendment rights, and should be suppressed in accordance with the Court's weighing of the costs and benefits. *See Herring v. United States*, 129 S. Ct. 695, 700, 172 L. Ed. 2d 496, 504 (2009) (explaining that the Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation" and that the "benefits of deterrence must outweigh the costs.").

## II. Whether Statements Should be Suppressed.

Defendant argues that any incriminating statements made during the unlawful entry should be suppressed. The Court agrees for the following reasons.

### A. Law Enforcement's Ruse Taints Parson's Statements

Defendant alleges that Parson's statements should be suppressed because they were tainted by close connection to an illegal search and seizure. The exclusionary rule extends to indirect products of an unlawful search. *Wong Sun*, 371 U.S. at 484-85, 83 S. Ct. at 415-16, 9 L. Ed. 2d at 453-54 . *Wong Sun* explained: "[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." *Id.* at 485-86, 83 S. Ct. at 416, 9 L. Ed. 2d at 454 . Whether the confession was the fruit of the earlier Fourth Amendment violation "must be answered on the facts of each case." *Brown v. Illinois*, 422 U.S. 590, 603-05, 95 S. Ct. 2254, 2262, 45 L. Ed. 2d 416, 427 (1975). The government has the burden of showing admissibility in that

25

the primary taint was purged. *Id.*

> Professor Lafave helpfully comments:

> > Although the Supreme Court has never confronted, except obliquely, a situation in which it was seriously contended that a confession was the fruit of a prior illegal search, in most such cases there is little doubt as to what the result should be. In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with evidence they had illegally seized, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates. Because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak, the more fine-tuned assessment used in *Brown* for determining when a confession is the fruit of an illegal *arrest* is ordinarily unnecessary when the "poisonous tree" is instead an illegal search.

3 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 9.4(a) (3d ed. 2007) (footnotes omitted).

The Court first finds that the incriminating statements would not have been obtained but for the violation of the Fourth Amendment. *See Hudson v. Michigan,* 547 U.S. 586, 592, 126 S. Ct. 2159, 2164, 165 L. Ed. 2d 56, 64-65 (2006) ("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."). Next, the Court considers whether the statements are sufficiently attenuated from the illegal search to be purged of any taint. *See id.* at 592-93. Factors to be assessed in analyzing this question are the following: temporal proximity of violation and confession; presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2262, 45 L. Ed. 2d 416, 427 (1975).

In this matter, any attenuation between Parson's statements and the Fourth Amendment violation is limited. First, Parson likely made any incriminating statements only because he allowed the agents

26

into his home under the pretense that they would help him with an identity theft problem. In other words, the agents utilized a ruse and misrepresentations to gain Parson's trust. The Court finds that this misconduct is particularly flagrant. This is not a matter of excusable neglect, simple mistakes, or mere negligent conduct. *See Herring v. United States*, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) ("As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.)" First, in this case, law enforcement seemed to entirely ignore this country's warrant regime, for no apparent reason other than perhaps lack of interest in paperwork or unwillingness to continue investigations to update untimely information. Second, law enforcement deliberately misled a vulnerable target as to the purpose of their visit, for the sole purpose of obtaining consent. The limited consent exception to the Fourth Amendment warrant requirement is not blanket permission for law enforcement agents to visit homes, deceive and browbeat a citizen, and hope to cure any problems by obtaining an essentially meaningless consent.

In short, exclusion of the obtained images without exclusion of Parson's related statements would frustrate the purposes of the Fourth Amendment. Suppression of these statements serves the purposes of the Fourth Amendment by protecting the privacy interests of Parson in his home, and judicially refusing to condone this specific unethical ruse program in order to, hopefully, cultivate a law enforcement system in which citizens may rely upon and trust.

Because the Court finds that Parson's statements should be suppressed due to close connection to a Fourth Amendment violation, the Court finds it unnecessary to analyze whether the statements were obtained in violation of Parson's Miranda rights.

## III. Conclusion

This Court echoes Cardozo's reticence in allowing potentially criminal behavior to go

27

unadjudicated simply "because the constable has blundered." *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926). However, "[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence."*Mapp v. Ohio,* 367 U.S. 643, 659, 81 S. Ct. 1684, 1694, 6 L. Ed. 2d 1081, 1092 (1961). In this matter, regardless of the precise words spoken in the trailer, it is beyond question that during and after the visits from the agents, Parson felt that his identity had been stolen. Given the increasing prevalence of identity theft, and the uniform concern among citizens, this Court cannot allow law enforcement to take advantage of a fearful subject in order to advance an unrelated criminal investigation.

Parson possesses a Fourth Amendment right to be free of an unreasonable search and seizure. Our culture is based upon the good faith of citizens, and citizens should be able to expect the same from the government in its law enforcement activities. Allowing government agents to ignore laws while purporting to enforce them would steadily lead to the dissolution of the rule of law. The facts of this fall well within the Supreme Court's theory of exclusion as recently reiterated in *Herring. See Herring*, 129 S. Ct. at 698-700, 172 L. Ed. 2d at 502-04 . The purposes of the exclusionary rule as applied here establish a remedy for an egregious violation of constitutional rights, and serve to discipline and deter extraconstitutional law enforcement behavior. In this matter, the agents' conduct fell far afield the realm of reasonable, and thus the computer files and related evidence, including Parson's statements, obtained from this illegal entry, search and seizure must be suppressed. An appropriate Order follows.

28

**AND NOW,** this 25th Day of February, 2009, in consideration of Defendant's Motion to Suppress (Doc. No. 42) and after a related hearing, IT IS HEREBY ORDERED that the Motion is granted, and such evidence as referenced therein shall be excluded at the time of trial.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**